

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**EASTERN DIVISION**

| | | |
|---|---|---|
| DAVID FOLSOM, | ) | No. ED CV 16-291-PLA |
| | ) | |
| Plaintiff, | ) | **MEMORANDUM OPINION AND ORDER** |
| | ) | |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN, ACTING | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**I.**

**PROCEEDINGS**

Plaintiff filed this action on February 17, 2016, seeking review of the Commissioner's denial of his application for Disability Insurance Benefits ("DIB"). The parties filed Consents to proceed before the undersigned Magistrate Judge on April 5, 2016, and July 20, 2016. Pursuant to the Court's Order, the parties filed a Joint Stipulation (alternatively "JS") on November 1, 2016, that addresses their positions concerning the disputed issues in the case. The Court has taken the Joint Stipulation under submission without oral argument.

/

/

## II.

## BACKGROUND

Plaintiff was born on June 29, 1966. [Administrative Record ("AR") at 135.] He has past relevant work experience as a construction worker, operating engineer, and carpenter. [AR at 637-38, 735-36.]

On March 14, 2011, plaintiff filed an application for a period of disability and DIB, alleging that he has been unable to work since April 23, 2010. [AR at 135-36.] Plaintiff's application and request for reconsideration were denied, and after a hearing, an unfavorable decision was issued on August 2, 2012. [JS at 2 (citations omitted); AR at 821-37.] Plaintiff filed a complaint in this Court in case number CV 13-2645-SVW (PLA), and on February 10, 2014, the Court remanded the matter for further proceedings. [AR at 871.] Three additional hearings were held on remand, at each of which plaintiff appeared represented by an attorney and testified on his own behalf. [AR at 650-75, 676-710, 711-46.] At the first hearing on October 14, 2014, a vocational expert ("VE") also testified; at the second hearing on January 13, 2015, a different VE and a medical expert ("ME") also testified; and, at the third hearing on May 7, 2015, because plaintiff had objected to the testimony of the VE at the second hearing as inconsistent with the Dictionary of Occupational Titles ("DOT"), a different VE testified. [AR at 621.] On June 26, 2015, the ALJ issued a partially favorable decision, concluding that plaintiff was not disabled prior to December 31, 2014, but became disabled on that date and continued to be disabled through June 26, 2015, the date of the decision. [AR at 621-40.] Plaintiff requested review of the ALJ's decision by the Appeals Council. [AR at 608-15.] When the Appeals Council denied plaintiff's request for review on December 19, 2015 [AR at 603-06], the ALJ's decision became the final decision of the Commissioner. See Sam v. Astrue, 550 F.3d 808, 810 (9th Cir. 2008) (per curiam) (citations omitted). This action followed.

/

/

/

## III.

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), this Court has authority to review the Commissioner's decision to deny benefits.  The decision will be disturbed only if it is not supported by substantial evidence or if it is based upon the application of improper legal standards.  Berry v. Astrue, 622 F.3d 1228, 1231 (9th Cir. 2010) (citation omitted).

"Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1159 (9th Cir. 2008) (citation and internal quotation marks omitted); Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998) (same).  When determining whether substantial evidence exists to support the Commissioner's decision, the Court examines the administrative record as a whole, considering adverse as well as supporting evidence. Mayes v. Massanari, 276 F.3d 453, 459 (9th Cir. 2001) (citation omitted); see Ryan v. Comm'r of Soc. Sec., 528 F.3d 1194, 1198 (9th Cir. 2008) ("[A] reviewing court must consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence.") (citation and internal quotation marks omitted).  "Where evidence is susceptible to more than one rational interpretation, the ALJ's decision should be upheld." Ryan, 528 F.3d at 1198 (citation and internal quotation marks omitted); see Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir. 2006) ("If the evidence can support either affirming or reversing the ALJ's conclusion, [the reviewing court] may not substitute [its] judgment for that of the ALJ.") (citation omitted).

## IV.

## THE EVALUATION OF DISABILITY

Persons are "disabled" for purposes of receiving Social Security benefits if they are unable to engage in any substantial gainful activity owing to a physical or mental impairment that is expected to result in death or which has lasted or is expected to last for a continuous period of at

1    least twelve months.  42 U.S.C. § 423(d)(1)(A); Drouin v. Sullivan, 966 F.2d 1255, 1257 (9th Cir.

2    1992).

3

4    **A.**     **THE FIVE-STEP EVALUATION PROCESS**

5        The Commissioner (or ALJ) follows a five-step sequential evaluation process in assessing

6    whether a claimant is disabled.  20 C.F.R. §§ 404.1520, 416.920; Lester v. Chater, 81 F.3d 821,

7    828 n.5 (9th Cir. 1995), as amended April 9, 1996.  In the first step, the Commissioner must

8    determine whether the claimant is currently engaged in substantial gainful activity; if so, the

9    claimant is not disabled and the claim is denied.  Id.  If the claimant is not currently engaged in

10   substantial gainful activity, the second step requires the Commissioner to determine whether the

11   claimant has a "severe" impairment or combination of impairments significantly limiting his ability

12   to do basic work activities; if not, a finding of nondisability is made and the claim is denied.  Id.

13   If the claimant has a "severe" impairment or combination of impairments, the third step requires

14   the Commissioner to determine whether the impairment or combination of impairments meets or

15   equals an impairment in the Listing of Impairments ("Listing") set forth at 20 C.F.R. part 404,

16   subpart P, appendix 1; if so, disability is conclusively presumed and benefits are awarded.  Id.  If

17   the claimant's impairment or combination of impairments does not meet or equal an impairment

18   in the Listing, the fourth step requires the Commissioner to determine whether the claimant has

19   sufficient "residual functional capacity" to perform his  past work; if so, the claimant is not disabled

20   and the claim is denied.  Id.  The claimant has the burden of proving that he is unable to perform

21   past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets this burden, a prima facie

22   case of disability is established.  Id.  The Commissioner then bears the burden of establishing

23   that the claimant is not disabled, because he can perform other substantial gainful work available

24   in the national economy.  Id.  The determination of this issue comprises the fifth and final step

25   in the sequential analysis.  20 C.F.R. §§ 404.1520, 416.920; Lester, 81 F.3d at 828 n.5; Drouin,

26   966 F.2d at 1257.

27   /

28

1    **B.      THE ALJ'S APPLICATION OF THE FIVE-STEP PROCESS**

2             At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since

3    April 23, 2010, the alleged onset date.[1]  [AR at 624.]  At step two, the ALJ concluded that since

4    the alleged onset date, plaintiff has had the following severe impairments:

5             [D]egenerative disc disease of the thoracic spine, with scoliosis; degenerative joint
              disease; gout; sleep apnea; cervical degenerative disc disease; lumbosacral
6             degenerative disc disease; thoracic degenerative disc disease with herniated disc
              and radiculopathy; peripheral neuropathy; depressive disorder, not otherwise
7             specified, with anxiety; and amphetamine abuse continuing at least into May 2011.

8    [AR at 64.]  He also determined that beginning on the established onset date of disability,

9    December 31, 2014, plaintiff had all of the foregoing impairments, as well as bilateral carpal tunnel

10   syndrome, and bilateral ulnar nerve entrapment at elbows.  [AR at 624-25.]  At step three, the ALJ

11   determined that since the alleged onset date of April 23, 2010, plaintiff has not had an impairment

12   or a combination of impairments that meets or medically equals any of the impairments in the

13   Listing.  [AR at 626.]  The ALJ further found that prior to December 31, 2014, the date that plaintiff

14   became disabled, plaintiff retained the residual functional capacity ("RFC")[2] to perform light work

15   as defined in 20 C.F.R. § 404.1567(b),[3] with the following restrictions:

16            [L]ifting and/or carrying 20 pounds occasionally and 10 pounds frequently; sitting,
              standing, and/or walking for six hours out of an eight-hour workday; occasional
17            performance of postural activities such as climbing, stooping, kneeling, crouching,

18            _____

19            [1]   The ALJ concluded that plaintiff met the insured status requirements of the Social
      Security Act through December 31, 2014.  [AR at 624.]

20
21            [2]   RFC is what a claimant can still do despite existing exertional and nonexertional
      limitations.  See Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).  "Between steps
22    three and four of the five-step evaluation, the ALJ must proceed to an intermediate step in which
      the ALJ assesses the claimant's residual functional capacity."  Massachi v. Astrue, 486 F.3d 1149,
23    1151 n.2 (9th Cir. 2007) (citation omitted).

24            [3]   "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying
      of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in
25    this category when it requires a good deal of walking or standing, or when it involves sitting most
      of the time with some pushing and pulling of arm or leg controls. To be considered capable of
26    performing a full or wide range of light work, you must have the ability to do substantially all of
      these activities. If someone can do light work, we determine that he or she can also do sedentary
27    work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for
      long periods of time."  20 C.F.R. § 404.1567(b).

28

and squatting; no balancing; no above-shoulder work bilaterally; occasional pushing and pulling bilaterally; frequent fingering, handling, and gripping; occasional stairs; no ladders, ropes, or scaffolds; no unprotected heights; would miss work one day every four to six weeks due to migraines; and limited to non-public, simple and routine tasks.

[AR at 629.] The ALJ further found that beginning on December 31, 2014, plaintiff retained the RFC to perform a range of light work with the following restrictions:

[L]ifting and/or carrying 20 pounds occasionally and 10 pounds frequently; sitting, standing, and/or walking for six hours out of an eight-hour workday; postural activities such as climbing, stooping, kneeling, crouching, and squatting can be performed on an occasional basis; no balancing; no above-shoulder work bilaterally; occasional pushing and pulling bilaterally; occasional stairs; no ladders, ropes, or scaffolds; no unprotected heights; would miss work one day every four to six weeks due to migraines; limited to non-public, simple, and routine tasks; no forceful grasping or torqueing with the bilateral hands, such as when opening a tight jar or holding a heavy object; and occasional fingering, handling, and gripping.

[AR at 637.] At step four, based on plaintiff's RFC and the testimony of the VE, the ALJ concluded that since April 23, 2010, the alleged onset date, plaintiff is unable to perform any of his past relevant work as a construction worker, operating engineer, and carpenter. [AR at 638-39.] At step five, based on plaintiff's RFC, vocational factors, and the VE's testimony, the ALJ found that prior to December 31, 2014, there were jobs existing in significant numbers in the national economy that plaintiff could perform, including work as an "order clerk" (DOT No. 209.567-014), "charge account clerk" (DOT No. 205.367-014), and "final assembler" (DOT No. 713.687-018). [AR at 638-39.] Accordingly, the ALJ determined that plaintiff was not disabled at any time from the alleged onset date of April 23, 2010, until December 31, 2014, the established date of disability. [AR at 639.] He also determined that beginning on December 31, 2014, plaintiff became disabled and continued to be disabled through June 26, 2015, the date of the decision. [AR at 640.]

## V.

## THE ALJ'S DECISION

Plaintiff contends that the ALJ erred when he: (1) violated the rule of mandate and/or law of the case on remand; (2) determined the established disability date of December 31, 2014; (3) determined plaintiff can perform the identified occupations at step five of the disability analysis;

and (4) discounted plaintiff's subjective symptom testimony.  [JS at 4.]  As set forth below, the Court agrees with plaintiff, and remands for further proceedings.

**A.    RULE OF MANDATE AND LAW OF THE CASE**

  **1.    Background**

Plaintiff contends that the ALJ violated the law of the case doctrine and/or the rule of mandate when he discredited the opinions of William Kaiser, Ph.D., plaintiff's worker's compensation mental health provider.  [JS at 4.]

The law of the case doctrine generally prohibits a court from considering an issue that has already been decided by that same court or a higher court in the same case.  Stacy v. Colvin, 825 F.3d 563, 567 (9th Cir. 2016) (citation omitted).  The rule of mandate "is similar to, but broader than, the law of the case doctrine."  Id. at 567-68 (citation omitted).  Under the rule of mandate, any "court that has received the mandate of an appellate court cannot vary or examine that mandate for any purpose other than executing it."  Id. at 568 (citation omitted).  The court on remand, however, may "decide anything not foreclosed by the mandate."  Id. (citation omitted). In Stacy, the Ninth Circuit held that both the law of the case doctrine and the rule of mandate apply in the social security context.  Id. at 566, 570.

Specifically, in its January 17, 2014, Report and Recommendation ("R&R"), accepted by the District Judge, who then entered judgment "consistent with" his Order Accepting the R&R, the Court found that Dr. Kaiser's opinions were amply supported by the "results of the multiple psychological tests Dr. Kaiser administered and [that] the treatment notes of plaintiff's therapy sessions support Dr. Kaiser's opinion regarding plaintiff's functional limitations."  [AR at 863 (citing AR at 354-56 (stating that "the ALJ failed to provide specific and legitimate reasons for rejecting Dr. Kaiser's opinion regarding the severity of plaintiff's mental impairment.")).]  The Court recommended two things of relevance here that became part of the remand order:  (1) because the ALJ improperly rejected the opinion of treating provider Dr. Kaiser, "on remand the ALJ shall credit Dr. Kaiser's opinion as a matter of law"; and (2) "with respect to . . . the ALJ's step-two

1  analysis, as Dr. Kaiser's opinion constitutes sufficient medical evidence that plaintiff's mental

2  impairment more than minimally affects his ability to perform basic work activities, plaintiff's mental

3  impairments shall be deemed severe on remand."  [AR at 866 (citing Smolen v. Chater, 80 F.3d

4  1273, 1290 (9th Cir. 1996); Edlund v. Massanari, 253 F.3d 1152, 1158 (9th Cir. 2001) (the step-

5  two inquiry is defined as "a de minimis screening device to dispose of groundless claims")).]

6        Plaintiff contends that notwithstanding the mandate, the ALJ discredited the February 2012

7  opinion of Dr. Kaiser.  [JS at 4-9.]

8

9        **2.    Analysis**

10        On February 7, 2012, Dr. Kaiser conducted a psychological evaluation of plaintiff in

11  connection with plaintiff's worker's compensation claim.  [AR at 347-65.]  Dr. Kaiser noted that

12  plaintiff's mental status examination revealed that plaintiff was depressed and anxious, his

13  "manner of communication was tense," he "appeared frustrated when revealing that he worries

14  about his future," and "distressed and disturbed when recounting that his body is broken."  [AR at

15  353-54.]  Dr. Kaiser also indicated that plaintiff was "defective in recall and concentration" and

16  "demonstrated diminished cognitive functioning in the clinical interview situation."  [AR at 354.]

17        In addition to conducting a mental status examination [AR at 353-54], Dr. Kaiser

18  administered several psychological tests to plaintiff,[4] including the Beck Depression Inventory, the

19  Beck Anxiety Inventory, the Neuroticism Scale Questionnaire ("NSQ"), and the Minnesota

20  Multiphasic Personality Inventory-2 ("MMPI-2").  [AR at 354-55.]  Dr. Kaiser found that the test

21  results on the Beck Inventories suggested a "moderate to severe" range of subjective depression;

22  that the NSQ Anxiety Scale score "placed [plaintiff] at approximately the 95th percentile for anxiety

23  in our population" and the Depression Scale yielded an "abnormally low" result, "correlat[ing] with

24  impulsiveness, overly rapid thought processes, possible failures in judgment, irritability, and

25  overall, hypomanic or manic-like states of mind, unconsciously designed to ward off underlying

26

27        [4]    Although the evaluation was signed by Dr. Kaiser, the record indicates that Thomas A.
     Curtis, M.D., a physician in the same medical group as Dr. Kaiser, also participated in the

28  evaluation by interpreting the results of the psychological tests.  [See AR at 354, 365.]

1  depression." [AR at 354-55.]  He also determined that the MMPI-2 test results were "abnormal."

2  [AR at 355.]

3       Dr. Kaiser noted that the medical staff at his facility had prescribed plaintiff medication for

4  depression and anxiety, and that plaintiff was diagnosed with "depressive disorder, not otherwise

5  specified with anxiety," "[p]sychological [f]actors [a]ffecting [m]edical [c]ondition (stress-intensified

6  headache, dermatological reaction, neck/shoulder/back muscle tension/pain, nausea, vomiting,

7  peptic acid reaction and abdominal pain/cramping)," and substance abuse.  [AR at 357, 359.]  He

8  also opined that plaintiff was "too beset by pain and disability, and too anxious and depressed to

9  work," and that plaintiff "needs to work through the emotional symptoms in the further passage of

10 time and supportive psychotherapy prior to attempting to return to any job."  [Id.]  Dr. Kaiser

11 concluded that plaintiff was "temporarily totally disabled on a combined physical and psychological

12 basis," with an estimated 75 percent of his psychiatric injury attributable to work-related injuries,

13 and "about 25 [percent] caused by [] past and personal life events and other factors."  [AR at 357-

14 58.]  Finally, Dr. Kaiser referred plaintiff for a four-month period of individual psychotherapy

15 sessions, and a three-month period of biofeedback sessions, to be "followed by weekly group

16 therapy after that for the next four to six months" -- i.e., between eight and ten months of mental

17 health treatment.  [AR at 358, 359.]  Dr. Kaiser stated that there "should be an assessment at that

18 time as to whether there will be a need for further supportive individual psychotherapy."[5]  [AR at

19 358.]

20      Following the remand, the ALJ at step two found that plaintiff has mild restrictions in

21 activities of daily living, and moderate difficulties in maintaining social functioning, and

22 concentration, persistence or pace.  [AR at 628-29.]  With respect to plaintiff's mental impairment

23 generally, the ALJ stated as follows:

24      The evidence of record related to [plaintiff]'s depressive disorder, anxiety, and
        history of amphetamine abuse also does not suggest [plaintiff] is precluded from all
25      work.   In February and March o[f] 2012, [plaintiff] was anxious, depressed,
        mistrusting, worried, fatigued, angry, frustrated, and had low self-esteem. However,
26

27      [5]  The psychiatric treatment notes reflect that plaintiff's mental health treatment continued into
28 2013 and 2014.  [See, e.g., AR at 1202-09, 1892-95.]

1    a subsequent treatment note from March of 2012 indicated [plaintiff] was able to
     reduce his tension level with biofeedback stress reduction treatment.  Treatment
2    notes 2013 [sic] and 2014 indicate largely normal psychiatric findings with some
     instance of poor attention span and a depressed and blunted affect.
3

4    [AR at 632 (citations omitted).]  With respect to Dr. Kaiser's February 2012 report, the ALJ stated

5    the following:

6        [O]n February 7, 2012, [plaintiff] underwent psychological evaluation and testing.
         The ensuing report indicates [plaintiff] had never undergone psychiatric
7        hospitalization, had not had any suicide attempts, and had never previously been
         prescribe[d] any psychotropic medication.  In fact, prior to the evaluation, [plaintiff]
8        had not had any professional contact with any psychotherapists but rather his first
         contact was an examination for this case.  During the evaluation, [plaintiff] was
9        communicative, albeit tense, once rapport was established. He appeared distressed
         and distraught when discussing his physical issues and lacked motivation.  He
10       demonstrated diminished cognitive functioning, defective recall and concentration,
         lost his train of thought, was unable to perform serial sevens, or recall past
11       presidents.  The undersigned notes, [plaintiff] was able to perform these two later
         [sic] tasks during a separate an[d] independent consultative examiner [sic].  Further,
12       his contact with reality and perceptions were intact as were his insight and judgment.
         . . . .
13

14       In compliance with the District Court's remand orders, the undersigned credits the
         opinion of William Kaiser, Ph.D., dated February 14, 2012, as a matter of law.
15       However, the undersigned credits Dr. Kaiser's opinion indicating [plaintiff] was
         temporarily totally disabled with little weight.   Dr. Kaiser conducted an initial
16       evaluation on [plaintiff].   While psychological test results were abnormal, the
         undersigned notes a large portion of the administered tests relied on [plaintiff's]
17       subjective complaints and self-reports rather than objective findings.  For example,
         although [plaintiff's] score on the Beck Depression Inventory was within the
18       moderate-to-severe range, this assessment is based on "subjective depression."
         The report also notes [plaintiff] had an abnormally low Depression Scale score,
19       which "would correlate" with signs of impulsiveness, overly rapid thought process,
         and irritability.  Similarly, the report predicted [plaintiff's] Histeria [sic] Scare score
20       "would probably correlate" with sign[s] such as excessive dependency longing and
         an inability to utilize anger effectively.  The undersigned notes these scores and/or
21       the interpretation of these scores are merely speculative.   Thus, while the
         undersigned duly notes [plaintiff's] behavior was withdrawn, anxious, and
22       depressed, little significance is given to these subjectively based reports and the
         speculative nature of the scores.  Notably, the report indicated [plaintiff] required
23       further passage of time, and supportive psychotherapy prior to attempting to return
         to any job.  These factors have occurred.  Notably, a[s] mentioned above, [plaintiff]
24       benefited from biofeedback treatment one month following this evaluation.
         Additionally, the undersigned does not find the [sic] Dr. Kaiser to be totally unbiased
25       in his findings given possible financial stakes in finding [plaintiff] to have severe
         psychological problems requiring treatment, which can be billed toward worker's
26       compensation.  For these reasons, the undersigned gives little weight to Dr. Kaiser's
         opinion.
     [AR at 632, 635 (citations omitted).]
27

28

                                                    10

1    Plaintiff argues that the ALJ too "narrowly read" the Court's R&R, and failed to adhere to

2    the mandate of the Court's remand order.  [JS at 7.]  He notes that the ALJ's finding that many of

3    the psychological tests relied on plaintiff's subjective complaints and self-reports rather than

4    objective findings directly contradicts the Court's remand order, which found that Dr. Kaiser's

5    opinion was supported by the results of the multiple psychological tests he administered and the

6    treatment notes of his therapy sessions.  [Id. (citations omitted).]  He also notes that the ALJ's

7    statement of compliance with the remand order insofar as he credited Dr. Kaiser's opinion as a

8    matter of law, is inconsistent with the ALJ's additional statement that he gave "little weight to Dr.

9    Kaiser's opinion."  [Id. (citing AR at 635).]

10   Defendant responds that in compliance with the remand order, "the ALJ found that plaintiff

11   had severe mental impairments consistent with Dr. Kaiser's" opinion, and further found that plaintiff

12   "was limited to non-public, simple and routine tasks, a significant mental limitation."  [JS at 10

13   (citing AR at 603, 624-25, 629, 635).]  Defendant asserts that, consistent with the ALJ's summary

14   of the evidence, "there are essentially no records showing the treatment and status of Plaintiff's

15   mental health after the March 28, 2012 progress note . . . on the effectiveness of biofeedback

16   (although Plaintiff did seek treatment for physical conditions during that time)."  [JS at 10 (citing

17   AR at 342, 601, 1069-83).]  According to defendant, "[s]ignificantly, it does not appear that Plaintiff

18   continued to exhibit any visible anxiety or distress or other mental symptoms," and "the  record

19   reveals . . . largely normal findings" in 2013 and 2014.  [JS at 11 (citations omitted).]  Defendant

20   also points out that "the ALJ accommodated Plaintiff's . . . irritable mood and poor attention span

21   by finding that Plaintiff could only perform non-public, simple and routine tasks," and also

22   considered Dr. Kaiser's finding that plaintiff "required further passage of time, and supportive

23   psychotherapy prior to attempting to return to any job," when he determined that "*[t]hese factors

24   have occurred*" (presumably referring to the passage of time and additional psychotherapeutic

25   treatment that occurred between Dr. Kaiser's February 2012 report and the ALJ's June 26, 2015,

26   decision).  [Id. (citations omitted) (emphasis in original).]  Defendant argues, therefore, that Dr.

27   Kaiser's opinion "left open the possibility of improvement following a 'temporary total disability,'

28

1   and the record showed improvement." [JS at 12.]  Finally, defendant observes that this Court
2   remanded the matter for further proceedings, which is inconsistent with plaintiff's argument that
3   if Dr. Kaiser's opinion "had been fully credited, no development would have been warranted" as
4   plaintiff would have been found disabled.  [JS at 13.]

5         The ALJ at least gave some effect to the Court's remand order by purporting to "credit the
6   opinion of [Dr. Kaiser] . . . as a matter of law," and including plaintiff's diagnoses of substance
7   abuse disorder, and "depressive disorder, not otherwise specified, with anxiety" as severe
8   impairments, as well as an RFC limitation to "non-public, simple and routine tasks." [AR at 624-25,
9   629, 635.]  However, the ALJ specifically gave "little weight" to Dr. Kaiser's opinion that plaintiff
10  was "temporarily totally disabled," and ultimately gave "little weight" to his opinion overall.  [AR at
11  635.]  While the ultimate legal conclusion as to whether a claimant is disabled under the Social
12  Security Act is an issue reserved to the Commissioner, the ALJ is still required to consider, and
13  give legally sufficient reasons for rejecting, a treating physician's subjective judgments about a
14  claimant's ability to work.  See Reddick, 157 F.3d at 725 (explaining that a physician may render
15  "medical, clinical opinions" or opinions on the ultimate issue of disability, and that the reasons
16  required to reject a treating doctor's opinion as to disability are comparable to those required for
17  rejecting a medical opinion); Lester, 81 F.3d at 832-33 ("The Commissioner is required to give
18  weight not only to the treating physician's clinical findings and interpretation of test results, but also
19  to his subjective judgments . . . . The treating physician's continuing relationship with the claimant
20  makes him especially qualified to . . . form an overall conclusion as to functional capacities and
21  limitations, as well as to prescribe or approve the overall course of treatment.").  As discussed in
22  more detail below, the ALJ did not give legally sufficient reasons for discounting Dr. Kaiser's
23  opinion about plaintiff's ability to work.

24        Additionally, the ALJ explicitly rejected Dr. Kaiser's findings from his psychological test
25  results.  However, the Court's remand order to credit Dr. Kaiser's opinion as a matter of law was
26  based in large part on the fact that Dr. Kaiser's psychological test results and the treatment notes
27  amply *supported* Dr. Kaiser's findings regarding plaintiff's functional limitations.  While claiming
28

1   to comply with the Court's order to credit Dr. Kaiser's opinion as a matter of law, the ALJ
2   nevertheless violated the law of the case doctrine and/or rule of mandate by discounting the
3   validity and reliability of the very test results upon which Dr. Kaiser's opinion was founded and
4   which this Court found to support Dr. Kaiser's opinion.  This was error and remand is warranted.

5          Even if the rule of mandate or the law of the case doctrine does not apply here, the ALJ's
6   reasons for discounting Dr. Kaiser's findings are not legally sufficient.  First, the ALJ states that
7   "a large portion of [Dr. Kaiser's] administered tests relied on [plaintiff's] subjective complaints and
8   self-reports rather than objective findings."  [AR at 635.]  He cites to test results interpreted by Dr.
9   Kaiser and/or Dr. Curtis that included language regarding "*subjective* depression," or "*predicted*"
10  that plaintiff's score "*would* correlate," or "*would probably* correlate" with certain characteristics.
11  [Id. (citing AR at 354, 355, 356) (emphasis added).]  Based on this language, the ALJ decided that
12  "these scores are merely speculative."  [Id.]  The ALJ may not substitute his lay opinion (here, in
13  determining that the results of widely recognized and utilized psychological tests were only
14  "speculative"), for that of a professional.  See Tackett v. Apfel, 180 F.3d 1094, 1102-03 (9th Cir.
15  1990).  By the ALJ's logic, a great deal of the clinical testing conducted by any psychologist or
16  psychiatrist -- no matter how reliable or valid that testing has been determined to be clinically --
17  could be discounted or rejected for this reason.  Moreover, Dr. Kaiser specifically addressed this
18  issue:  "[Plaintiff's] L, F, K scores [on the MMPI-2] . . . indicated a *valid profile* for *standard*
19  *interpretation* of the clinical scale scores and profile of the MMPI-2.  This correlated with *accuracy*
20  *of self-report of emotional symptoms in the subjective psychological tests and in the clinical history*
21  *and examination setting*."  [AR at 355 (emphasis added).]  Additionally, he stated that "[i]t should
22  be noted that T scores at or above 65 on the [MMPI-2] clinical scales [1 through 0] are *generally*
23  *considered* significant and abnormal."  [AR at 356 (emphasis added).]  Dr. Kaiser concluded:

24          In summary, the psychological test results *confirmed* excessive depression, anxiety,
            somatization and dependency/failed repression.  The "V" configuration in scales 1,
25          2, and 3 (the Hypochondriasis Scale, the Depression Scale, and the Hysteria Scale)
            on the MMPI-2, formed a characteristic pattern termed the "conversion V."  This
26          pattern would correlate with attempted suppression of conscious anxiety and
            depression and the probable resultant conversion of underlying emotional distress
27          into intensified physical complaints.

28

[Id.]  In short, Dr. Kaiser found that plaintiff's subjective complaints as reflected by the Beck Inventory and other psychological testing, were supported by the results on the MMPI-2, and the MMPI-2 results themselves were consistent with plaintiff's complaints.  Accordingly, this was not a legitimate reason to discount Dr. Kaiser's opinion.

The ALJ also relied on one treatment note written one month after Dr. Kaiser's report, that the ALJ claimed showed that plaintiff had "benefited from biofeedback."  [AR at 635 (citing AR at 342).]  That March 28, 2012, treatment note states the following:

> [Patient] is able to reduce his level of tension . . . during the session by practicing autogenesis and diaphragmatic breathing tech[niques] monitored by biofeedback inst[rument].  Temp[erature] 80.8, 81.3, 84.7.  [Patient] to continue practicing relaxation with self-regulating exercises.

[AR at 342.]  This note does not in any way reflect that plaintiff's ability to use biofeedback to increase his temperature at this one session continued into later sessions or led to any lasting reduction in his anxiety and depression.  In fact, an individual psychotherapy note one week earlier reflected that plaintiff exhibited visible anxiety, depressed expressions, and mistrust; ventilated his distress; and appeared insecure, worried, fatigued, frustrated, angry, and with low self-esteem.  A week prior to that, in addition to those characteristics, plaintiff appeared "very stressed," and also exhibited irritability, loss, hurt, and reduced self-confidence.  [AR at 343, 344.]  Additionally, notwithstanding plaintiff's success at this one biofeedback training session, psychiatric treatment records after that date continue to reflect stress, anger, depression, anxiety, helplessness, hopelessness, poor sleep, poor appetite, and other similar symptoms.  [See, e.g., AR at 1202-09, 1843-69, 1892-95.]  In fact, the ALJ's "laundry list" of 2013 and 2014 "treatment notes" purportedly reflecting "largely normal psychiatric findings" [AR at 632 (citing medical exhibits in the record)], reflect the following:  (1) Exhibit 18F at 3, 7, 15, 19, 24, and 28:  these were not psychiatric treatment notes, but "Pain Progress Notes," dated between January and September 2013, in which the treating pain management doctor merely indicated that plaintiff suffered from anxiety and depression, his mood was the "same" (without explanation as to what that meant), and plaintiff was generally alert and oriented, with appropriate insight, judgment, speech, and thought

processes for the examination [see, e.g., AR at 1123, 1127, 1135, 1139, 1144, 1149]; (2) Exhibit 19F at 5, 12:  "Progress Notes" dated February and July 2013, from plaintiff's orthopedist indicating only that plaintiff's mood and affect were appropriate for the examination [see, e.g., AR at 1156, 1163]; (3) Exhibit 21F at 3:  this October 19, 2013, Psychiatric Progress Note, in addition to indicating "poor attention span," and a "depressed and blunted affect," also reflects that plaintiff's mood was "dysthymic with irritable affect," and that plaintiff reported he was not doing good, and had a lot of anger, depression, helplessness, hopelessness, and worry [see, e.g., AR at 1203, 1204]; this note also reflected that plaintiff had been treated for depression since 2010, was prescribed an anti-depressant (Remeron), and a medication generally prescribed for treating bipolar mania and/or migraine headaches (Depakote), and had a current diagnosis of bipolar disorder, unspecified [AR at 1203, 1204]; (4) Exhibit 23F at 16, 22:  these progress notes dated in March and May 2014 from the treating provider at "Pain Management Solutions," reflected the provider's objective assessment that plaintiff had intact memory, judgment, insight, and normal mood and affect at those treatment visits [see, e.g., AR at 1233, 1238]; (5) Exhibit 27F at 8, 38, 81:  these primary care physician treatment notes from July 2014 reflect that plaintiff appeared "alert and oriented" or had intact memory, judgment and insight, normal mood and affect at those office visits [AR at 1298, 1328]; (6) Exhibit 33F at 87:  this October 2013 pre-surgical history and physical report noted that plaintiff's fund of knowledge, judgment and insight were appropriate for the situation, and also noted that plaintiff had a diagnosis of depression [AR at 1686-87]; (7) Exhibit 35F at 5, 8, 11, 14, 17, 20, 23, and 26:  these February through September 2014 psychiatric notes, in addition to noting such characteristics as irritability, a very dysythmic mood with blunted affect, frustration, and anger, also reflected that plaintiff reported a high stress level, and had been diagnosed with bipolar disorder; he also reported he had been receiving a lumbar-level epidural every other month, and a thoracic-level epidural every third month [AR at 1847, 1850, 1853, 1856, 1858, 1859, 1862, 1865, 1867, 1868]; and (8) Exhibit 38F:  an October 2014 psychiatric progress note indicating that plaintiff's mood was "very irritable with blunted affect," and also reflecting that plaintiff had been diagnosed with bipolar disorder.  [AR at 1893, 1894.]

Thus, it appears that after the initial ten months of mental health treatment recommended by Dr. Kaiser, it had been determined that plaintiff needed "further supportive individual psychotherapy" and treatment for his mental health conditions, and that treatment continued. There is no evidence in the record that plaintiff's initial ability to utilize biofeedback techniques at one training session resulted in any transferable long-term benefit with respect to his mental health condition.  An ALJ must consider all of the relevant evidence in the record and may not point to only those portions of the record that bolster his findings.  See, e.g., Holohan v. Massanari, 246 F.3d 1195, 1207-08 (holding that an ALJ cannot selectively rely on some entries in plaintiff's records while ignoring others); Aukland v. Massanari, 257 F.3d 1033, 1035 (9th Cir. 2001) ("[T]he [ALJ]'s decision 'cannot be affirmed simply by isolating a specific quantum of supporting evidence.'") (citing Sousa v. Callahan, 143 F.3d 1240, 1243 (9th Cir. 1998)); see also Reddick, 157 F.3d at  722-23 (it is impermissible for the ALJ to develop an evidentiary basis by "not fully accounting for the context of materials or all parts of the testimony and reports").  Based on the foregoing, the ALJ's reliance on one biofeedback session note to demonstrate any sort of significant improvement in plaintiff's mental status one month after his evaluation by Dr. Kaiser is misplaced, and this was not a legally sufficient reason to discount Dr. Kaiser's findings.

The ALJ also states that prior to Dr. Kaiser's evaluation, plaintiff "had not had any professional contact with any psychotherapists," and that he had not been prescribed any psychotropic medications.  [AR at 632.]  However, on June 21, 2011, plaintiff reported to Dr. Bagner that he had "been seeing a psychiatrist for several months but recently lost his medical insurance," and was taking anti-depressants.[6]  [AR at 330, 331.]  In fact, plaintiff reported on July 21, 2010, that he thought he was experiencing depression, and was suffering from stress, memory loss, and sleep disturbances [AR at 320, 325], and plaintiff's patient chart from Cucamonga Valley Medical reflects that on August 18, 2010, plaintiff had a diagnosis of "major depressive disorder," and "adjustment reaction," and had been prescribed citalopram hydrobromide (commonly known

---

[6]   Because Dr. Bagner did not provide the name of the anti-depressant plaintiff had taken, it is not known whether that medication fell into the category of "psychotropic" medications. [AR at 330; but see infra note 7.]

1   as Celexa,[7] an anti-depressant).  [See AR at 294, 298.]  There are also records that appear to

2   indicate that plaintiff did not have health insurance for certain periods, which may explain gaps in

3   his mental health treatment.  [See, e.g., AR at 330 (plaintiff reported to Dr. Bagnar on June 21,

4   2011, that he had been seeing a psychiatrist for several months but had recently lost his medical

5   insurance), 344 (in March 2012 plaintiff reported to his therapist that he is "very stressed" and has

6   no medical coverage).]  Thus, despite what he told Dr. Kaiser, it appears that plaintiff -- whether

7   or not he actually saw a "psychotherapist," or had previously been prescribed "psychotropic"

8   medication -- had received treatment and medication for his depression prior to February 2012.

9   This was not a specific or legitimate reason to discount Dr. Kaiser's findings.

10      Finally, the ALJ also found Dr. Kaiser was not "totally unbiased" because he had a financial

11   stake in finding that plaintiff needed continued treatment, "which can be billed toward worker's

12   compensation."  [AR at 635.]  The ALJ points to no evidence that Dr. Kaiser was anything but

13   professional in conducting his examination and writing his report, recommending mental health

14   treatment for plaintiff.  Moreover, it could just as easily be said that an ME, a VE, a state agency

15   reviewing or consulting physician, and a treating physician, all of whom are compensated in some

16   way for examining a claimant, or for reviewing the records and rendering their opinions in an

17   action, are not "totally unbiased."  An ALJ is not entitled to reject a medical opinion based "on the

18   purpose for which medical reports are obtained."  Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d

19   1190, 1195 (9th Cir. 2004) (citing Lester, 81 F.3d 821, 832 (9th Cir. 1995)).  Moreover, an ALJ

20   "may not disregard a . . . medical opinion simply because it was initially elicited in a state workers'

21   compensation proceeding . . . ."  Booth v. Barnhart, 181 F. Supp. 2d 1099, 1105 (C.D. Cal. 2002).

22   Thus, in the absence of specific evidence showing bias, the ALJ's questioning of Dr. Kaiser's

23   motives for evaluating plaintiff's mental health conditions in the way that he did was not a specific

24   or legitimate reason to discount Dr. Kaiser's findings.

---

27      [7]   Celexa is considered a psychotropic medication.  See National Alliance on Mental Illness
28   ("NAMI") Fact Sheet, Commonly Prescribed Psychotropic Medications, http://www.namihelps.org/assets/PDFs/fact-sheets/Medications/Commonly-Psych-Medications.pdf.

1    Remand is warranted based on the ALJ's failure to comply with the rule of mandate and

2    the law of the case doctrine.

3

4    **B.    ESTABLISHED DISABILITY DATE OF DECEMBER 31, 2014**

5    In his decision, the ALJ stated that "the evidence since December 31, 2014 supports the

6    restrictions identified" in the RFC determination beginning on December 31, 2014 [AR at 625,

7    637]:

8    [T]he undersigned finds [plaintiff's] mild bilateral ulnar neuropathy, mild cubital tunnel
     syndrome, and mild bilateral carpal tunnel (CTS) syndrome were nonsevere
9    impairments from the alleged onset date through December 31, 2014 because they
     are only slight abnormalities and do not affect [plaintiff] more than minimally.  While
10   the undersigned finds [plaintiff's] CTS became severe as of December 31, 2015
     [sic], the remaining nonsevere impairments continued to be nonsevere.  [Plaintiff]
11   testified he suffered from neuropathy in the arms and CTS, which resulted in a
     tendency to drop things.  Treatment included use of braces on his hands beginning
12   July of 2014 and braces for his arms in October of 2013.  [Plaintiff] further claimed
     he was limited in his ability to grasp or hold objects, open jars, concentrate, engage[]
13   in more than frequent bilateral fingers, perform overhead reaching.  However,
     treatment records prior to December 31, 2014 do not suggest a severe impairment.
14   In July of 2012, [plaintiff] had *some* swelling in the lateral epidcondylar [sic] of the
     bilateral elbows.  However, the compartments were soft and sensation was intact.
15   The condition was treated with a topical gel.  In February, July, and October of 2013,
     [plaintiff] had positive Tinel's test results bilaterally and tenderness to palpation at
16   the medial and lateral epicondyle and radial head bilaterally.  An EMG/NCS study
     perform[ed] in July of 2013 demonstrated only borderline to mild cubital tunnel
17   syndrome. However, X-ray results, from January of 2013, of the left and right elbow,
     were entirely normal.  In July of 2014, physical exam findings included bilateral
18   Tinel's signs in the cubital tunnel and weakness, but [plaintiff] had full range of
     motion in the hands, wrists, and elbows.  This evidence does not suggest more than
19   minimal impact prior to December 31, 2014.  Thus, these alleged impairments are
     not severe [prior to December 31, 2014].

20
     . . . .
21
     [T]he undersigned finds that, beginning on December 31, 2014, [plaintiff's]
22   allegations regarding his symptoms and limitations are generally credible.[8]  During
     this period, while the evidence pertaining to [plaintiff's] back, neck, and mental
23   impairment were similar to those dated prior to December 31, 2014, [plaintiff's]
     upper extremity condition worsened resulting in more restrictive limitations.  Positive
24   findings included decreased strength in his bilateral hands at three out of five,
     decreased strength in the left and right upper extremity, and positive Hoffman's

25

26   _____
     8    The ALJ determined that plaintiff's "subjective complaints [prior to December 31, 2014,] are
27   less than fully credible and the objective medical evidence does not support the alleged severity of
     the symptoms." [AR at 636-37; see also AR at 630 (noting that plaintiff's statements regarding his
28   symptoms "are not entirely credible prior to December 31, 2014").]

                                              18

Case 5:16-cv-00291-PLA   Document 18   Filed 11/29/16   Page 19 of 31   Page ID #:2433

signs in January of 2015. In February of 2015, [plaintiff] had decreased right arm movement with walking and treatment notes indicate bilateral CTS and bilateral ulnar nerve entrapment at the elbows. In March of 2015, [plaintiff] was unable to use a standard walker due to restricted use of one hand and was prescribed a four-wheeled walker to increase safety. In addition to use of a four-wheeled walker, treatment included medications and use of wrist splints. These findings suggest, in addition to the restrictions assessed for the period prior to December 31, 2014, [plaintiff] has been further restricted to no forceful grasping or torquing with the bilateral hands, such as when opening a tight jar or holding a heavy object, and occasional fingering, handling, and gripping.

[Id. (citations omitted) (emphasis added).]

Plaintiff contends that the ALJ erred by failing to consult with a medical expert regarding plaintiff's alleged date of disability but instead inferred an established date of December 31, 2014, which also happened to be plaintiff's date last insured for Title II purposes, thereby denying plaintiff benefits under Title II. [JS at 15-16 (citing Soc. Sec. Ruling ("SSR")[9] 83-20).] SSR 83-20 provides that the ALJ "should call on the services of a medical advisor when onset must be inferred." Plaintiff notes that he was suffering from bilateral elbow pain "long before the established onset date and the distinction between the two RFC [assessments] (pre-onset and post-established onset) hinged on manipulative limitations." [JS at 16-17.] He points to a July 10, 2012, treatment note that indicates plaintiff had severe bilateral elbow pain since November 20, 2011, and, in contrast to the ALJ's acknowledgment of "some" swelling, the treating provider noted "*significant* swelling in the lateral epicondylar area," with pain bilaterally on extension and flexion of the wrists, and "elicited throughout the forearm area bilaterally." [JS at 17 (citing AR at 601).] He also notes that at the 2012 hearing, he reported that he was being treated for extreme elbow pain bilaterally, and testified as to the nature of that pain. [JS at 19 (citing AR at 749, 757).] He states that when he was seen at the Arrowhead Regional Medical Center on July 1, 2014, he reported he had been having arm and hand pain for two years. [Id. (citing AR at 1443).] Additionally, in 2013, he was "treated for increased weakness and shooting pain in his elbow." [Id. (see, e.g., AR at 1153-89).]

---

[9] "SSRs do not have the force of law. However, because they represent the Commissioner's interpretation of the agency's regulations, we give them some deference. We will not defer to SSRs if they are inconsistent with the statute or regulations." Holohan, 246 F.3d at 1202 n.1 (citations omitted).

Plaintiff presented to Dr. LaRose on February 6, 2013, complaining of pain in his elbows and wrists since approximately December 2011. [AR at 1179.] The record shows that between February and October 2013, Dr. LaRose diagnosed plaintiff with, and treated plaintiff for, bilateral lateral epicondylitis, and bilateral cubital tunnel. [See, e.g., AR at 1153, 1166.] Plaintiff also contends that the ALJ failed to consider plaintiff's need for an assistive device prior to December 2014, after he was determined to be a "fall risk" in September 2013. [Id. (citing AR at 1728, 1733).] He argues that if the need for a cane and his bilateral elbow and hand pain had been credited, he would have been found disabled earlier than December 31, 2014. [Id.]

Defendant responds that the ALJ's determination of an established disability date of December 31, 2014, was not arbitrarily decided and "reflected a worsening in Plaintiff's physical condition." [JS at 17, 19.] Defendant claims that SSR 83-20 "refers to the determination of a disability onset date for progressive impairments, and the need to seek expert assistance where the medical evidence is not definite and an inference is necessary." [Id. (citations omitted).] Here, according to defendant, "the onset date had a legitimate medical basis as the ALJ relied on testifying medical expert Arnold Ostrow who reviewed the available medical records through November 2014 and found that Plaintiff had no physical limitations precluding the performance of a range of light work." [JS at 18.] Defendant submits that the ALJ properly found plaintiff disabled on December 31, 2014, "based on more recent medical evidence that Plaintiff had developed additional hand and arm limitations" -- evidence from a period Dr. Ostrow had not considered. [Id.] Finally, defendant contends that although plaintiff previously suffered bilateral elbow pain as early as 2011, "it was related to tendinitis, an inflammation of a tendon instead of an ulnar nerve condition" [id.], and that there was no evidence that plaintiff needed an assistive device despite being deemed a fall risk in September 2013 following surgery. [JS at 19 (citations omitted).]

The record supports plaintiff's position. As noted even by defendant, plaintiff's hand and arm limitations had been present since 2011 and, therefore, no matter the underlying reason for plaintiff's pain, this condition seems to fall within the category of a "progressive" impairment

1    covered by SSR 83-20.  As the records that Dr. Ostrow did not have available to him regarding

2    plaintiff's hand and arm impairments might provide additional reasons to consider an earlier onset

3    date of plaintiff's bilateral elbow and hand pain and any functional limitations as a result of that

4    pain, the ALJ on remand, in accordance with SSR 83-20, shall determine, with the assistance of

5    a medical advisor as needed, whether there is evidence to support an established disability date

6    prior to December 31, 2014.  In making this determination, the ALJ shall also evaluate plaintiff's

7    alleged need for an assistive device prior to that date.

8

9    **C.    STEP FIVE ANALYSIS**

10          Plaintiff contends that the ALJ failed to properly reconcile the VE's testimony that an

11   individual with plaintiff's RFC could perform the jobs of order clerk, charge account clerk, and final

12   assembler, prior to December 31, 2014, with the requirements for those occupations as described

13   by the DOT.  [JS at 20.]  He argues that plaintiff's limitation to simple, repetitive tasks, is

14   inconsistent with the jobs of order clerk and charge account clerk that require level three reasoning

15   skills, and the ALJ did not obtain a "reasonable explanation" from the VE for the apparent conflict.

16   [JS at 20-21.]  He also contends that with respect to the occupation of final assembler, his RFC

17   limitation to no above-shoulder work bilaterally, occasional pushing and pulling bilaterally, and

18   frequent fingering, handling, and gripping, conflicts with the frequent reaching, handling, and

19   fingering requirement for this occupation as indicated by the DOT.  [JS at 21.]

20          Defendant notes that the hearing in May 2015 was held specifically to address whether a

21   preclusion from above-shoulder work would be precluded given the frequent reaching requirement

22   for performing the final assembler occupation.  [JS at 23.]

23          The record reflects that the VE specifically testified at the hearing in May 2015 that plaintiff's

24   preclusion from above-shoulder work, and limitation to occasional pushing and pulling, would not

25   lead to any erosion of the numbers of positions available in the national economy for the three

26   occupations suggested by the VE, and that none of the three occupations required more than

27   frequent handling and fingering.  [AR at 667-68.]  He specifically testified that these three positions

28

1  are sedentary jobs, "so any sort of exertion is fairly small . . . [a]nd the[] order clerk would be

2  pushing like a mouse or a piece of paper around or something like that.  Nothing really heavy."

3  [AR at 667.]  Thus, the ALJ identified the conflict, and the VE addressed it and provided a

4  reasonable explanation for the conflict involving reaching.

5      Accordingly, even if there is a conflict between plaintiff's limitation to simple, repetitive work,

6  and the ability to perform the reasoning level 3 positions of order clerk and charge account clerk --

7  and the Court believes, based on Zavalin v. Colvin, 778 F.3d 842, 843-44, 847 (9th Cir. 2015), that

8  there is such a conflict -- any error was harmless as plaintiff could still perform the final assembler

9  occupation, with a reasoning level of 1.  DOT No. 713.687-018.

10     On remand, however, because the ALJ will be reassessing plaintiff's RFC in light of Dr.

11 Kaiser's report, which will be credited as a matter of law, and reassessing plaintiff's established

12 date of disability, the ALJ, if warranted, shall obtain the testimony of a VE to determine if there are

13 occupations plaintiff is capable of performing in light of his impairments, and resolve the conflicts,

14 if any, between any of plaintiff's limitations and those occupations.

15

16 **D.    SUBJECTIVE SYMPTOM TESTIMONY**

17     **1.    Plaintiff's Contention**

18     Plaintiff contends the ALJ erred in discounting plaintiff's subjective symptom testimony, and

19 the error was not harmless.  [JS at 25-28.]  He also notes that the ALJ's "miraculous[]" finding that

20 plaintiff was credible as of December 31, 2014, "does not pass muster" under the clear and

21 convincing reasons standard for discounting subjective symptom testimony.  [JS at 27.]

22     Defendant argues that the ALJ "gave Plaintiff the benefit of the doubt and partially credited

23 his testimony," finding that plaintiff was limited to a "modest range of light work with no overhead

24 work and involving non-public simple, routine tasks, and . . . could no longer perform his past

25 work."  [AR at 29.]  Defendant also argues that the ALJ relied on the fact that "Plaintiff's mental

26 and physical condition and pain improved with treatment -- mostly physical therapy and

27 medications, which he tolerated," as evidenced by plaintiff's testimony that in 2010 he was able

28

to mow the lawn despite his pain, and exercised three times a week.  [JS at 30 (citing AR at 304, 310, 631-32).]  Additionally, defendant notes that in August 2013 plaintiff performed strengthening exercises requiring forty pounds of force, and in May 2014, he "indicated he was tolerating his medications and was feeling 'better.'"  [JS at 31 (citing AR at 1337, 1484).]

## 2.   Legal Standard

"To determine whether a claimant's testimony regarding subjective pain or symptoms is credible, an ALJ must engage in a two-step analysis."[10] <u>Lingenfelter v. Astrue</u>, 504 F.3d 1028, 1035-36 (9th Cir. 2007).  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'"  <u>Treichler v. Comm'r of Soc. Sec. Admin.</u>, 775 F.3d

_____

[10]   On March 28, 2016, after the ALJ's assessment in this case, SSR 16-3p went into effect.  <u>See</u> SSR 16-3p, 2016 WL 1119029 (Mar. 16, 2016).  SSR 16-3p supersedes SSR 96-7p, the previous policy governing the evaluation of subjective symptoms.  <u>Id.</u> at *1.  SSR 16-3p indicates that "we are eliminating the use of the term 'credibility' from our sub-regulatory policy, as our regulations do not use this term."  <u>Id.</u>  Moreover, "[i]n doing so, we clarify that subjective symptom evaluation is not an examination of an individual's character[;] [i]nstead, we will more closely follow our regulatory language regarding symptom evaluation."  <u>Id.</u>  Thus, the adjudicator "will not assess an individual's overall character or truthfulness in the manner typically used during an adversarial court litigation.  The focus of the evaluation of an individual's symptoms should not be to determine whether he or she is a truthful person."  <u>Id.</u> at *10.  The ALJ is instructed to "consider all of the evidence in an individual's record," "to determine how symptoms limit ability to perform work-related activities."  <u>Id.</u> at *2.  The ALJ's 2014 decision was issued before March 28, 2016, when SSR 16-3p became effective, and there is no binding precedent interpreting this new ruling including whether it applies retroactively.  <u>Compare</u> <u>Ashlock v. Colvin</u>, 2016 WL 3438490, at *5 n.1 (W.D. Wash. June 22, 2016) (declining to apply SSR 16-3p to an ALJ decision issued prior to the effective date), <u>with</u> <u>Lockwood v. Colvin</u>, 2016 WL 2622325, at *3 n.1 (N.D. Ill. May 9, 2016) (applying SSR 16-3p retroactively to a 2013 ALJ decision); <u>see</u> <u>also</u> <u>Smolen</u>, 80 F.3d at 1281 n.1 (9th Cir. 1996) ("We need not decide the issue of retroactivity [as to revised regulations] because the new regulations are consistent with the Commissioner's prior policies and with prior Ninth Circuit case law") (citing <u>Pope v. Shalala</u>, 998 F.2d 473, 483 (7th Cir. 1993) (because regulations were intended to incorporate prior Social Security Administration policy, they should be applied retroactively)).  Here, SSR 16-3p on its face states that it is intended only to "clarify" the existing regulations.  However, because the ALJ's findings regarding this issue fail to pass muster irrespective of which standard governs, and neither party specifically contends that SSR 16-3p should apply herein [<u>but</u> <u>see</u> JS at 27, 28 (acknowledging that SSR 16-3p superceded SSR 96-7p)], the Court need not resolve the retroactivity issue.  Notwithstanding the foregoing, SSR 16-3p shall apply on remand.

1  1090, 1102 (9th Cir. 2014) (quoting Lingenfelter, 504 F.3d at 1036) (internal quotation marks

2  omitted).  If the claimant meets the first test, and the ALJ does not find evidence of malingering,

3  the ALJ must "evaluate the intensity and persistence of [the] individual's symptoms . . . and

4  determine the extent to which [those] symptoms limit his or her ability to perform work-related

5  activities . . . ."  SSR 16-3p, 2016 WL 1119029, at *4 (capitalization omitted).  In addition to

6  considering all of the evidence, factors to be considered in weighing a claimant's subjective

7  symptom testimony under either SSR 16-3p or 96-7p include:  (1) the individual's daily activities;

8  (2) the location, duration, frequency, and intensity of the individual's pain or other symptoms; (3)

9  factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side

10  effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5)

11  treatment, other than medication, the individual receives or has received for relief of pain or other

12  symptoms; (6) any measures the individual uses or has used to relieve pain or other symptoms;

13  and (7) any other factors concerning the individual's functional limitations and restrictions due to

14  pain or other symptoms.  SSR 16-3p, 2016 WL 1119029, at *7; SSR 96-7p; 20 C.F.R. §

15  404.1529(c); see also Ghanim v. Colvin, 763 F.3d 1154, 1163 (9th Cir. 2014) (discussing other

16  factors that may be considered in assessing *credibility*, including (1) ordinary techniques of

17  credibility evaluation, such as reputation for lying, prior inconsistent statements, and other

18  testimony that appears less than candid; and (2) unexplained or inadequately explained failure to

19  seek treatment or follow a prescribed course of treatment).

20        Where, as here, plaintiff has presented evidence of an underlying impairment, and the ALJ

21  did not find "affirmative evidence" of malingering [see generally AR at 625-37], the ALJ's reasons

22  for rejecting plaintiff's subjective symptom statements must be specific, clear and convincing.

23  Burrell v. Colvin, 775 F.3d 1133, 1136 (9th Cir. 2014) (citing Molina v. Astrue, 674 F.3d 1104, 1112

24  (9th Cir. 2012));  Brown-Hunter v. Colvin, 806 F.3d 487, 488-89 (9th Cir. 2015); Treichler, 775 F.3d

25  at 1102.  "General findings [regarding a claimant's credibility] are insufficient; rather, the ALJ must

26  identify what testimony is not credible and what evidence undermines the claimant's complaints."

27  Burrell, 775 F.3d at 1138 (quoting Lester, 81 F.3d at 834) (quotation marks omitted).  The ALJ's

28

findings "'must be sufficiently specific to allow a reviewing court to conclude the adjudicator rejected the claimant's testimony on permissible grounds and did not arbitrarily discredit a claimant's testimony regarding pain.'" Brown-Hunter, 806 F.3d at 493 (quoting Bunnell v. Sullivan, 947 F.2d 345-46 (9th Cir. 1991) (en banc)).  A "reviewing court should not be forced to speculate as to the grounds for an adjudicator's rejection of a claimant's allegations of disabling pain." Bunnell, 947 F.2d at 346.  As such, an "implicit" finding that a plaintiff's testimony is not credible is insufficient.  Albalos v. Sullivan, 907 F.2d 871, 874 (9th Cir. 1990) (per curiam).

### 3.    Analysis

#### a.    Lack of Objective Medical Evidence

The ALJ primarily relies on a lack of objective medical evidence to discount plaintiff's subjective symptom testimony.  [See generally AR at 629-37.]  While a lack of objective medical evidence supporting a plaintiff's subjective complaints cannot provide the only basis to reject a claimant's subjective symptom testimony (see Light v. Soc. Sec. Admin., 119 F.3d 789, 792 (9th Cir. 1997)), it is one factor that an ALJ can consider in evaluating symptom testimony.  See Burch v. Barnhart, 400 F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence cannot form the sole basis for discounting pain testimony, it is a factor the ALJ can consider in his credibility analysis."); accord Rollins v. Massanari, 261 F.3d 853, 857 (9th Cir. 2001).   As the Ninth Circuit recently held, "an ALJ's 'vague allegation' that a claimant's testimony is 'not consistent with the objective medical evidence,' without any 'specific finding in support' of that conclusion, is insufficient."  Treichler, 775 F.3d at 1103 (citation omitted).  The "ALJ must identify the testimony that was not credible, and specify 'what evidence undermines the claimant's complaints.'"  Id. (citation omitted); Brown-Hunter, 806 F.3d at 493.

Here, the ALJ first discussed plaintiff's testimony.  [AR at 630.]  The ALJ then generally discussed the objective medical record and the weight given to the various providers.  [AR at 630-37.]  He pointed out treatment notes from 2010 that reflected normal test results and improvement after thoracic facet joint blocks, and later treatment notes where plaintiff reported that the

1    treatment, therapy, or medication improved his pain symptoms.  [AR at 631-32.]  Next, he stated

2    his conclusion that the RFC "is supported by the evidence as a whole," and plaintiff's "subjective

3    complaints are less than fully credible and the objective medical evidence does not support the

4    alleged severity of symptoms."  [AR at 636-37.]

5            The ALJ, however, failed to "identify the testimony that was not credible, and specify 'what

6    evidence undermines the claimant's complaints.'"  Id. (citation omitted); Brown-Hunter, 806 F.3d

7    at 493.  In short, the ALJ's stated reasons for finding that the objective medical evidence did not

8    support plaintiff's subjective symptom statements, or were a reason to find him "less than fully

9    credible," are not sufficiently specific for the Court to conclude that the ALJ did not arbitrarily

10   discredit plaintiff's testimony, nor can the error be found harmless.  Id. at 493 (rejecting the

11   Commissioner's argument that because the ALJ set out his RFC and summarized the evidence

12   supporting his determination, the Court can infer that the ALJ rejected the plaintiff's testimony to

13   the extent it conflicted with that medical evidence, because the ALJ "never identified *which*

14   testimony she found not credible, and never explained *which* evidence contradicted that

15   testimony") (citing Treichler, 775 F.3d at 1103, Burrell, 775 F.3d at 1138).

16           Thus, this was not a specific, clear and convincing reason for discounting plaintiff's

17   subjective symptom testimony.

18

19                       **b.    Conservative Treatment History**

20           The ALJ commented that plaintiff's treatment was "limited to injections, pain medications,

21   epidurals, traction, decompression therapy, and physical therapy," seemingly implying that

22   plaintiff's treatment had been conservative.  [AR at 631.]  A review of the record finds this to be

23   an oversimplification at best.  Plaintiff received extensive treatment for his physical pain and

24   mental health conditions.  According to his testimony, and supported by the records, plaintiff

25   testified he had received psychiatric treatment and medications, multiple pain medications, three

26   types of physical therapy, thoracic spine epidurals, lumbar spine epidurals, radiofrequency ablation

27   in the lumbar spine (which he described as a procedure that severs the nerve completely), and

28

1    he was being evaluated for cubital release surgery, consulting with neurosurgeons about back

2    surgery, and had been referred to a neurologist.  [AR at 691-93.]

3           An ALJ may properly rely on the fact that only routine and conservative treatment has been

4    prescribed.  Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995).  "Conservative treatment" has

5    been characterized by the Ninth Circuit as, for example, "treat[ment] with an *over-the-counter pain*

6    *medication*" (see, e.g., Parra v. Astrue, 481 F.3d 742, 751 (9th Cir. 2007) (emphasis added);

7    Tommasetti v. Astrue, 533 F.3d 1035, 1040 (9th Cir. 2008) (holding that the ALJ properly

8    considered the plaintiff's use of "conservative treatment including physical therapy and the use of

9    anti-inflammatory medication, a transcutaneous electrical nerve stimulation unit, and a

10   lumbosacral corset")), or a physician's failure "to prescribe . . . any serious medical treatment for

11   [a claimant's] supposedly excruciating pain."  Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir.

12   1999).

13          However, at issue here is whether plaintiff's treatment regimen constitutes "conservative

14   treatment."  This Court has previously found that spinal epidural injections are not "conservative"

15   treatment.  See, e.g., Harvey v. Colvin, 2014 WL 3845088, at *9 (C.D. Cal. Aug. 5, 2014)

16   (injections to the cervical region consisting of stellate ganglion blocks that were not entirely

17   effective did not support ALJ's reliance on conservative treatment to support an adverse credibility

18   finding) (citing Yang v. Barnhart, 2006 WL 3694857, at *4 (C.D. Cal. Dec.12, 2006) (ALJ's finding

19   that claimant received conservative treatment was not supported by substantial evidence when

20   claimant underwent physical therapy and epidural injections, and was treated with several pain

21   medications)); see Miller v. Astrue, 2009 WL 800227, at *3 (E.D. Cal. Mar. 25, 2009) (ALJ's finding

22   that claimant was not credible properly considered "the conservative nature of [claimant's]

23   treatment" since claimant "was not a surgical candidate, did not use a TENS unit, had not

24   undergone epidural steroid injections and only intermittently took pain medications").  Additionally,

25   plaintiff has been prescribed strong narcotic medications to help control his pain, as well as

26

27

28

psychotropic medications to help control his depression,[11] and may be a candidate for surgical intervention.

Thus, this was not a specific, clear and convincing reason for discounting plaintiff's subjective symptom testimony.

### 4.   Conclusion

Based on the foregoing, the ALJ's subjective symptom testimony determination was not "sufficiently specific" to allow this Court to conclude that the ALJ rejected plaintiff's testimony on permissible grounds and did not arbitrarily discredit his testimony regarding pain and fatigue. Brown-Hunter, 806 F.3d at 493 (quoting Bunnell, 947 F.2d at 345-46).  Remand is warranted on this issue.

## VI.

## REMAND FOR FURTHER PROCEEDINGS

The Court has discretion to remand or reverse and award benefits.  McAllister v. Sullivan, 888 F.2d 599, 603 (9th Cir. 1989).  Where no useful purpose would be served by further proceedings, or where the record has been fully developed, it is appropriate to exercise this discretion to direct an immediate award of benefits.  See Lingenfelter, 504 F.3d at 1041; Benecke v. Barnhart, 379 F.3d 587, 595-96 (9th Cir. 2004).  Where there are outstanding issues that must be resolved before a determination can be made, and it is not clear from the record that the ALJ would be required to find plaintiff disabled if all the evidence were properly evaluated, remand is appropriate.  See Benecke, 379 F.3d at 593-96.

---

[11]   The Court recognizes that the case authority considering whether use of narcotic pain medication by itself constitutes "conservative" treatment goes both ways.   Under the circumstances here, however, where plaintiff has been prescribed strong narcotic medications, has undergone invasive procedures such as radiofrequency ablation and epidural injections in multiple parts of his spine, as well as psychiatric treatment, physical therapy, and consultations with pain management specialists and surgical specialists, such treatment history negates the ALJ's implied finding that plaintiff's treatment as a whole was conservative.

In this case, there are outstanding issues that must be resolved before a final determination can be made.  In an effort to expedite these proceedings and to avoid any confusion or misunderstanding as to what the Court intends, the Court will set forth the scope of the remand proceedings.

First, Dr. Kaiser's February 7, 2012, evaluation and the opinions therein shall be credited as a matter of law, and  plaintiff's mental impairments shall again be deemed severe on remand. Because the ALJ failed to provide specific and legitimate reasons for discounting Dr. Kaiser's opinion that plaintiff was temporarily totally disabled,[12] this opinion -- as well as any opinion in his evaluation regarding plaintiff's mental health impairments generally, or that suggests plaintiff has work-related limitations[13] -- shall also be credited as a matter of law.  See Widmark, 454 F.3d at 1069 ("Because the ALJ failed to provide adequate reasons for rejecting [the examining physician]'s opinion, we credit it as a matter of law."); Edlund, 253 F.3d at 1160 (crediting, as a matter of law, improperly rejected treating physician opinions).  The ALJ on remand shall not disturb the Court's finding that Dr. Kaiser's opinions are amply supported by the "results of the multiple psychological tests Dr. Kaiser administered and [that] the treatment notes of plaintiff's therapy sessions support Dr. Kaiser's opinion regarding plaintiff's functional limitations."  [AR at 863.]

---

[12]    Although somewhat unclear, it appears that Dr. Kaiser found that plaintiff was temporarily totally disabled for some period of time between four and ten months, with reevaluation to be conducted after four months.  [See AR at 358 (recommending weekly psychotherapy for four months and then assessment "as to whether there is a need for further supportive individual psychotherapy"), 359 (recommending four months of individual psychotherapy followed by weekly group therapy for another four to six months).]  As previously discussed herein, plaintiff's mental health treatment continued into 2013 and 2014.  [See, e.g., supra note 5.]

[13]    For instance, in finding plaintiff to be temporarily totally disabled, Dr. Kaiser noted the following:  "it would not be possible to estimate, on a psychiatric basis, a return-to-work date for regular or modified work" or whether, "on a psychiatric basis[,] . . . [plaintiff] will eventually be emotionally able to engage in the occupation he performed at the time of the injury" [AR at 363]; plaintiff "was found to be too beset by pain and disability, and too anxious and depressed to work" [AR at 357]; plaintiff suffered from anxiety, depression, sleep problems, fatigue, and "a number of other stress-related symptoms" [AR at 358]; and, "it would not yet be possible to estimate the residuals of permanent emotional impairment, if any."  [AR at 363.]

Second, because the ALJ failed to provide specific, clear and convincing reasons, supported by substantial evidence in the case record, for discounting plaintiff's subjective symptom testimony prior to December 31, 2014, the ALJ on remand, in accordance with SSR 16-3p, shall reassess plaintiff's subjective allegations and either credit his testimony as true, or provide specific, clear and convincing reasons, supported by substantial evidence in the case record, for discounting or rejecting any subjective symptom testimony prior to that date.[14]

Third, the ALJ on remand, with the assistance of a medical advisor as necessary, shall consider all of the evidence of record and whether it supports an established disability date earlier than December 31, 2014.[15]  This determination must have a legitimate medical basis.  SSR 83-10.

Finally, the ALJ shall reassess plaintiff's RFC and determine, at step five, with the assistance of a VE if necessary, whether there are jobs existing in significant numbers in the national economy that plaintiff can still perform.[16]  The ALJ, with the assistance of the VE, shall resolve the conflicts, if any, between any of plaintiff's limitations and the requirements of those occupations.

## VII.

## CONCLUSION

**IT IS HEREBY ORDERED** that:  (1) plaintiff's request for remand is **granted**; (2) the decision of the Commissioner is **reversed**; and (3) this action is **remanded** to defendant for further

---

[14]   Nothing in this decision is intended to disturb the ALJ's finding that the record supports plaintiff's subjective symptom testimony as of December 31, 2014.

[15]   Nothing in this decision is intended to disturb the ALJ's findings that plaintiff (1) has the severe impairments of degenerative disc disease of the thoracic spine, with scoliosis; degenerative joint disease; gout; sleep apnea; cervical degenerative disc disease; lumbosacral degenerative disc disease; thoracic degenerative disc disease, with herniated disc and radiculopathy; peripheral neuropathy; depressive disorder, not otherwise specified with anxiety; amphetamine abuse continuing at least into May 2011; bilateral carpal tunnel syndrome; and bilateral ulnar nerve entrapment at the elbows; or (2) was disabled at least as of December 31, 2014.

[16]   Nothing herein is intended to disrupt the ALJ's step four finding that plaintiff is unable to return to his past relevant work.

proceedings consistent with this Memorandum Opinion.

**IT IS FURTHER ORDERED** that the Clerk of the Court serve copies of this Order and the Judgment herein on all parties or their counsel.

**This Memorandum Opinion and Order is not intended for publication, nor is it intended to be included in or submitted to any online service such as Westlaw or Lexis.**

DATED:  November 29, 2016

_____
PAUL L. ABRAMS
UNITED STATES MAGISTRATE JUDGE

31